**MASAO HIRASUNA, doing business as Mike's Auto Top Shop & Upholstery Shop, Appellant,**

v.

**S. V. McKENNEY, District Director of Internal Revenue, Appellee.**

No. 14995.

United States Court of Appeals
Ninth Circuit.
April 12, 1957.

Rehearing Denied May 17, 1957.

plies, and dismissed this suit for a tax refund. Plaintiff appeals.

The essential facts are not in dispute. During the years here in question, appellant taxpayer, Masao Hirasuna, operated a business under the style of "Mike's Auto Top and Upholstery Shop," in Honolulu. A good part of his business, and the only part with which we are here concerned, consisted of the making and installing of automobile seat covers on the order of used car dealers.

Appellant covered the seats of from two to five cars a day, his business coming from about a dozen used car dealers in the area. The procedure on each car began with the taking out and measuring of the cushions. The cloth was then cut to an approximate length and laid on top of the cushion. It was next pulled tight, pinned, and marked with chalk. The facing cloth was then pinned on and chalked. The cloth was next taken off and cut, the piping was sewed, and the cut portions were sewed together. The seats were then vacuum cleaned, and, if necessary, the springs were replaced. The factory seat covers were not removed, but rips in them were repaired by sewing. The corners of the seats were wadded with cotton, after which the new covers were installed with tacks or hog rings. Variations in the operation were required according to the construction of the back cushion and the presence or absence of movable arm rests.

The prices appellant charged car dealers for sets of custom-made seat covers were eighteen dollars for fibre, twenty-eight dollars for plastic, and thirty-five dollars for leatherette. These prices included all material and labor, but did not include any allowance for a federal excise tax. Appellant testified that about two thirds of the price represented the cost of material.

Early in 1953, agents of the district director of internal revenue for the Hawaii District made an assessment against appellant in the sum of $1,766.70 for excise taxes due as the manufacturer of automobile parts and accessories. This assessment covered the years 1949 to

Shiro Kashiwa and Genro Kashiwa, Honolulu, Hawaii, for appellant.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, I. Henry Kutz, Walter R. Gelles, Washington, D. C., Louis B. Blissard, U. S. Atty., Charles B. Dwight, III, Honolulu, Hawaii, for appellee.

Before ORR, FEE, and HAMLEY, Circuit Judges.

HAMLEY, Circuit Judge.

The question presented on this appeal is whether the federal manufacturers' excise tax applies to automobile seat covers which were custom-made and installed on the order of used car dealers. The trial court held that the tax ap-

1952, and up to September, 1953. It was stipulated that $374.78 of this sum was properly assessed on sales not here in question. This left in dispute, as the tax claimed to be due on the manufacture and sale of seat covers on the order of used car dealers, the sum of $1,391.92. The sum so assessed excluded from consideration that portion of the price which, in the view of the district director, represented a reasonable charge for installing the covers after they had been made. Appellant paid the tax as assessed, and regularly filed his claims for refund, which preceded the bringing of this action.

The taxing statute in question is § 3403(c) of the Internal Revenue Code of 1939, 53 Stat. 410, as amended, 26 U.S. C.A. (I.R.C.1939) § 3403.[1] This statute is applicable here only if these seat covers were automobile "parts or accessories" which appellant, as the "manufacturer" thereof, "sold" to the used car dealers. Appellant contends that the trial court erred in holding that these specified conditions were met with respect to the transactions which have been described.

First to be considered is the question of whether these custom-made seat covers are "parts or accessories," within the meaning of the taxing statute. Section 316.55 of Treasury Regulation 46 (1940 ed.), promulgated under the Internal Revenue Code of 1939, defines this term.[2] A substantially similar definition of the term has been held to be reasonable and proper. Universal Battery Co. v. United States, 281 U.S. 580, 50 S.Ct. 422, 74 L.Ed. 1051.

Custom-made automobile seat covers are used primarily to "improve, repair, replace, or serve as a component part of" automobile bodies. Clause (a). They are designed to be "attached to or used in connection with" automobile bodies, to add to their utility or ornamentation. Clause (b). The primary use of such seat covers is "in connection with" automobile bodies. Clause (c). Hence, it would appear that such seat covers are "parts or accessories," under all three clauses of the first paragraph of § 316.-55.

Appellant, however, directs attention to the second paragraph of § 316.55. He argues that, in view of this paragraph, an article is not to be deemed a "part or accessory" unless it has reached such a stage of manufacture that it is "commonly or commercially" known as a part or accessory. According to appellant, custom-made seat covers, prior to installation, cannot be deemed to have reached such a state of manufacture.

In our view, however, the second paragraph of § 316.55 is not meant as an additional requirement to be superimpos-

1. The pertinent part of this section reads as follows:
"There shall be imposed upon the following articles sold by the manufacturer, producer, or importer, a tax equivalent to the following percentages of the price for which so sold:

\* \* \* \* \*

"(b) Other automobile chassis and bodies \* \* \* suitable for use on or in connection with passenger automobiles \* \* \*.

"(c) Parts or accessories \* \* \* for any of the articles enumerated in subsection (a) or (b), 8 per centum \* \* \*".

2. The applicable portion of § 316.55 reads as follows:
"Sec. 316.55. Definition of parts or accessories. The term 'parts or accessories' for an automobile truck or other automobile chassis or body, taxable tractor, or motorcycle, includes (a) any article the primary use of which is to improve, repair, replace, or serve as a component part of such vehicle or article, (b) any article designed to be attached to or used in connection with such vehicle or article to add to its utility or ornamentation, and (c) any article the primary use of which is in connection with such vehicle or article whether or not essential to its operation or use.

"The term 'parts and accessories' shall be understood to embrace all such articles as have reached such a stage of manufacture that they are commonly or commercially known as parts and accessories whether or not fitting operations are required in connection with installation. The term shall not be understood to embrace raw materials used in the manufacture of such articles."

ed on the requirements set forth in the first paragraph. The real purpose of the second paragraph is not to restrict the scope of the first, but to prevent the first from being too narrowly construed in a situation where "fitting operations" are required in connection with installation.

■ We therefore conclude that custom-made automobile seat covers are "parts or accessories," within the meaning of the statute.

Next to be considered is the question of whether appellant was the "manufacturer" of these custom-made seat covers, within the meaning of the statute.

■ Appellant advances several arguments in support of his view that this was not a manufacturing process. One of these is that it could not be manufacture because the seat covers are not produced and kept in stock for sale as general articles of commerce. This contention was considered and rejected by the United States Court of Appeals for the Fourth Judicial Circuit in the very recent case of United States v. Keeton, 4 Cir., 238 F.2d 878 decided November 8, 1956.[3] We are in accord with the view expressed in the Keeton case.

■ Appellant's principal contention appears to be that the operation in question could not be manufacture because it constitutes repair work. The operation is repair work, he asserts, because the

dominant aspect of the transaction is the performance of work and not the production of material, and because the process is essentially for the purpose of restoring the article of another to its normal condition.

While, as before indicated, this case involves only the installation of seat covers for used car dealers, the record reveals that appellant installs seat covers on some new cars. Other persons engaged in the same business also undoubtedly install such covers in both new and used cars. Appellant's "repair" theory, now under discussion, would not apply as to new cars. If the theory is accepted, it would therefore be necessary for those engaged in the business to set up records differentiating between new and used car transactions.[4]

Turning to the merits of appellant's "repair" argument, it will first be observed that it finds no support in the treasury regulation defining the term "manufacturer." Section 316.4 of Treasury Regulation 46 (1940 ed.), promulgated under the Internal Revenue Code of 1939, reads as follows:

"Sec. 316.4. *Who is a manufacturer.* The term 'manufacturer' includes a person who produces a taxable article from scrap, salvage, or junk material, as well as from new or raw material, (1) by processing, manipulating, or changing the form of an article, or (2) by com-

3. In holding that custom-made seat covers are subject to the federal excise tax, the court there said:

"* * * While more often than not one might think of an article sold by a manufacturer as an article completed independently of the method of selling it, this is not decisive. In applying section 3403(c) its language must be accorded reasonable scope, including different types of manufacturing. The tax must not be so narrowly applied as to leave beyond its reach activities which are fairly within the intendment and language of the statute. There is no 'clear-cut reason for limiting the apparent generality of the statutory term[s] involved.' Fides, A. G. v. Commissioner, 4 Cir., 137 F.2d 731, 734. The seat covers are distinctly iden-

tifiable as articles manufactured and sold by taxpayer. Masao Hirasuna v. McKenney, supra [D.C.Hawaii, 135 F.Supp. 897]. Compare John J. Roche Co. v. Eaton, D.C.Conn., 14 F.2d 857." 238 F.2d 880.

4. Certain other administrative difficulties would also be encountered in giving effect to this "repair" theory. It is likely that seat covers are sometimes installed in used cars, not because the original upholstery is in need of repair, but to glamorize the used car for purposes of sale. In view of this fact, would the circumstance that a used car was involved be sufficient to establish the transaction as a "repair" job, or must there be some showing as to whether the original upholstery was actually in need of repair?

bining or assembling two or more articles."

We approved this definition in United States v. Armature Exchange, 9 Cir., 116 F.2d 969, 971, certiorari denied 313 U.S. 573, 61 S.Ct. 960, 85 L.Ed. 1531, holding that it had been given the force of law by subsequent congressional reenactments of the taxing statute.

Appellant's operation constituted manufacturing within the meaning of both clauses (1) and (2) of the quoted paragraph of § 316.4. He processed, manipulated, and changed the form of certain new materials, consisting of covering fabrics, facing cloth, and other items, to produce an automobile accessory, which is a "taxable article." He combined or assembled these materials to produce such "taxable article." It will be noted that this definition does not take into account the use which is to be made of the article after it has been produced.

Counsel for appellant, at the oral argument, urged that this definition of "manufacture" is so broad that, if given full effect, it would include a great many minor mechanical operations performed in the course of repairing machinery, equipment, or almost anything else. If this be granted, it still does not mean that the products of such minor operations will necessarily be subject to the tax. In order to be taxable, the article manufactured must be a "part or accessory," and it must have been "sold" by the manufacturer.[5] These requirements are sufficient to exclude from the operation of the tax most of the minor operations which appellant had in mind. In any event, the possibility that the definition may, sometime in the future, require limitation to meet the needs of some other case does not argue against application of the definition here.

But, quite apart from this definition, we do not believe that appellant's operations fall within the classification of "repair" transactions to which he makes reference. It is true that, in replacing broken seat springs and patching rips in the original upholstery, appellant did perform some repair work. The cost of this work was not included in computing the excise tax. But the installation of new, removable covers was in addition to this repair work.[6] The second phase of appellant's operation does not constitute repair, for the reason that his labor and efforts were not applied to the restoration of the existing article (the original upholstery), but were rather applied to the fashioning of a new and independent item.

We hold that appellant was the "manufacturer" of the seat covers in question.

Under the taxing statute in question, a tax is not to be imposed upon manufactured parts or accessories unless they are "sold" by the manufacturer. Appellant argues that he did not contract to sell the seat covers, within the meaning of the Uniform Sales Act, but supplied them under contracts for work, labor, and material. He also contends that the reimbursement claimed for the work of chalking, marking, cutting, and sewing the covers was an installation charge, and not part of a sales price.

The question is not whether appellant "contracted to sell" the seat covers, but whether he sold them. We believe that he did. The price charged for a manufactured article is, of course, intended to cover not only the cost of the raw material, but the labor involved in the manufacturing process. Here, the taxpayer quoted flat charges of eighteen, twenty-eight, and thirty-five dollars for the covers, the variance depending only on the kind of materials used. When the seat covers were installed, title passed to the used car dealers. This consummated a sale of the covers, within the

5. See footnote 1.

6. While on the witness stand, appellant described the process of installing custom-made seat covers. He was asked if he took the factory cover off the seat. He indicated that he did not, saying: "Well, if there is [sic] any rips or some kind of damage I usually repair it and cover it." This would appear to be a recognition by appellant that any "repair" work involved in the process was that which was necessary in preparing the original upholstery to receive the custom-made covers.

meaning of 26 U.S.C.A. § 3403. Whether it was also a "sale" within the meaning of the Uniform Sales Act, is immaterial.

The work of chalking, marking, cutting, and sewing the covers was plainly a part of the manufacturing process. The work of installation took place after all of this had been done, and the seat covers had been made. As before indicated, the true installation charges were deducted in computing the tax.

Appellant contends that the assessment in question runs counter to the construction which the agency placed upon the taxing statute during most of the period covered by the assessment. Several evidences of the claimed inconsistent construction are relied upon, the first consisting of a number of public rulings.

The one public ruling which deals specifically with the kind of transactions involved in this case is dated August 18, 1952.[7] This ruling expressly supports the interpretation of the statute on which appellee here relies. It was issued near the end of the taxing period covered by the assessment under review. It contains a recital to the effect that, under previous rulings, such transactions were also held to be taxable.

Since there were no previous public rulings holding such transactions to be taxable, the "rulings" referred to in this recital must have been private rulings. The record indicates that neither appellant nor bureau representatives in Hawaii had knowledge of such private rulings prior to issuance of the August 18, 1952, public ruling.

The public rulings prior to August 18, 1952, upon which appellant relies are four in number. The first of these[8] deals with the tax liability of a jobber or dealer who cuts or processes raw or bulk material to produce a part or accessory. The ruling draws a distinction between an immediate repair job and a sale for future use. If the jobber or dealer cuts or produces a part or accessory from lengths or rolls of material for immediate use by a *repairman* in a *repair* job on which he is then working, the sale thereof by the jobber or dealer to the *repairman* is deemed to be a sale of material not subject to tax. If, however, the jobber or dealer transforms lengths or rolls of material into parts or accessories and places the finished articles in stock for future use or disposition, he thereby becomes, according to this ruling, the "manufacturer" of such articles, and his subsequent sale or use of them is taxable.

Appellant wants us to infer from this ruling that the agency thereby determined that one is not a "manufacturer" within the meaning of the statute unless he stocks the finished article for future use or disposition; and that if the article is prepared for immediate use, it is a sale of material not subject to tax.

7. S.T. 944, 1952–2, Cum.Bull. 255. This provision reads in part:

"The Bureau has issued rulings heretofore that the only circumstances under which the tax does not apply to sale of seat covers by a manufacturer, is where the seat covers are individually designed, cut, tailored, and fitted by the manufacturer to the automobile belonging to the person who contracts for the performance of such operation, and such person is the consumer of the seat covers. Such rulings provided, however, that the sale of seat covers, similarly produced, to a dealer in new or used automobiles is not a sale for consumption but one for resale, and that the tax attached to the manufacturer's sale thereof.

"Upon reconsideration of the matter, the Bureau is now of the opinion that where a manufacturer furnishes the material and produces automobile seat covers for the consumer thereof, according to individual design and measurement, the sale by the manufacturer of such seat covers is taxable under section 3403(c) of the Code, as amended, regardless of whether they are installed by the manufacturer or by other persons.

"The Bureal has issued rulings, as stated above, that sales by a manufacturer of seat covers, produced according to individual design and measurements, to a dealer in new or used cars are not considered sales for consumption, and are subject to tax. The taxability of such sales is not affected by the ruling herein, and tax continues to attach, as in the past, to such sales."

8. S.T. 824, XIV–2 Cum.Bull. 368 (1935).

This ruling, however, does not deal with the kind of transaction under review on this appeal. It deals with two kinds of transaction by a jobber or dealer—the production and stocking of articles for future disposition or use, and the production of articles for immediate use by a *repairman* in a *repair* job. Under the ruling, the first transaction is that of a "manufacturer," as would also be the case if appellant produced and stocked seat covers for future disposition or use.

The second transaction is a sale of material, and does not involve manufacture, because the article is to be immediately used by a repairman on a repair job. If appellant were being taxed for some article which he had produced for immediate use (by himself or another) on a *repair* job, the ruling referred to above would be persuasive in his favor. Here, however, we have concluded that the installation of custom-made seat covers is not repair work. It follows that the ruling in question has no application to the facts of this case.

What is said above is also sufficient to distinguish the three other public rulings upon which appellant relies.[9] In each of such rulings, it is provided that the article described in the ruling will escape taxation only when it is processed for use in connection with an immediate repair job.

■■■ To be given any effect, an administrative construction must be a ruling which can reasonably be held to have decided the point presently in issue. Anderson v. McKay, 94 U.S.App.D.C. 11, 211 F.2d 798, 805. As indicated above, the four rulings just discussed did not deal with the point here in issue.

We therefore conclude that these public rulings are not helpful in deciding the question of statutory construction now before us.

We do not have before us the question of whether private, as distinguished from public, rulings amounted to an administrative construction of the act, for no evidence as to any such private rulings is to be found in this record. Nor is there here a showing as to general inaction by the bureau with regard to the assessment of such transactions sufficient to present a question of administrative construction.

Appellant, however, refers to the fact that the agency failed to appeal from a 1926 district court decision adverse to the agency's present position, as an evidence of administrative construction to the effect that such transactions are not taxable. The decision in question was rendered in John J. Roche Co. v. Eaton, D.C.Conn.1926, 14 F.2d 857, 858. It was there held that the dominant aspect of the transaction engaged in by the taxpayer was that of work performed, and that the furnishing of specially fashioned materials was but an incident of the major transaction. The court was there speaking not only of custom-made seat covers, but of side curtains, tops, carpets, upholstery, and the repair of automobile bodies.

The pronouncement of the court was probably correct as to some or all of these other types of work. In view of the fact that the question of seat covers was apparently a minor phase of that case, we do not believe that the agency's failure to appeal represents an administrative construction of the statute favorable to appellant's position.[10]

---

9. S.T. 582, XI–2 Cum.Bull. 472 (1932) (repairs on automobiles, such as upholstering, replacement of woodwork, repair of fenders); S.T. 573, XI–2 Cum. Bull. 473 (1932) (rebabbiting connecting rods and reclaiming brake drums); S.T. 940, 1951–2 Cum.Bull. 214 (replacing glass).

10. We also believe that the Roche case was not correctly decided, but that is beside the point with regard to our present inquiry concerning administrative construction. In Johnnie & Mack, Inc., v. United States, D.C.S.D.Fla.1954, 123 F.Supp. 400, the district court reached the same conclusion as was reached in the Roche case. The decision of the court in that case seemed to have been influenced by the view that, on August 18, 1952, the Commissioner of Internal Revenue made what the court thought was an invalid distinction between past sales to automo-

On the record before us, the proof as to what administrative construction was in effect prior to August 18, 1952, is inconclusive. This, therefore, is not a case in which such construction can be resorted to as an aid in determining the meaning of the statute. Our view as to that meaning, as recorded above, has accordingly been arrived at without reference to any determination the bureau may have made concerning the taxability of such transaction.

Affirmed.

**JAMES ALGER FEE, Circuit Judge (dissenting).**

The main opinion is erroneous because it apparently decides that the construction of the statute and regulations which is there adopted in 1957 would override a consistent long standing administrative interpretation by the federal agency itself.

This statute and the applicable regulations are not so plain in the commands thereof to leave nothing for construction. Indeed, these were construed contrary to our present interpretation in 1926 by the opinion in John J. Roche Co. v. Eaton, 9 Cir., 14 F.2d 857. This theory was affirmed and adopted by a District Court in 1954 in Johnnie & Mack, Inc., v. United States, 123 F.Supp. 400.

The main opinion here resolves the matter as if the case were of first impression. So does the decision in United States v. Keeton, 4 Cir., 238 F.2d 878. But in the instant case the point was squarely raised that the agency had acquiesced in the construction of the statute in the Roche case for a period of over twenty-five years and, as a result, had left untaxed installers of seat covers on automobiles. It was also contended that this course of action was summarily reversed after the bulletin of August, 1952, by the identical agency. It may be agreed that the evidence was insufficient in the instant case. But the exact contention has been raised in other cases, notably, Martin v. Andrews, 9 Cir., 238 F.2d 552, where we held that the suit was premature and where the merits were not considered. We should not bind all of the judges of this Court to our present interpretation in other causes where more evidence of contrary administrative practice might conceivably be produced.

It may be said that the main opinion does not rule upon the administrative practice. True, it does not in so many words. But we should not disapprove of the long standing judicial construction initiated by the Roche case and brought up to date in the Johnnie & Mack case. If the agency were proven to have acquiesced therein, it might be possible that such an acceptance of the rule might be binding upon not only the agency, but also upon this Court. Then we should not hold that the bulletin of August 18, 1952, is the only public ruling which deals specifically with the type of transaction in this litigation here. It may be the only one in this record. Besides, there might be debate as to how "public ruling" should be defined. Further, simply because we have construed the statute and regulations as res nova, we should not construe other pronouncements of the bureau as dealing with collateral matters in virtue of our construction. It might be possible to show that all the action and inaction of the agency in this field is consistent with an interpretation binding upon us and inconsistent with our present holding on the letter of the statute and regulations. Again, no "private rulings" are found to be in the record. But there should be no intimation of an estoppel or waiver based upon knowledge or lack of knowledge. Finally, the inaction of the agency and their failure to collect taxes from or prosecute installers of seat covers over a limited area should be treated as of great importance. Instead, the practice

bile owners and past sales to used car dealers. We do not think the distinction is invalid. In any event, however, this does not appeal to us as a good reason for refusing to apply the taxing statute in transactions involving automobile dealers.

in the limited area seems to be treated as of no consequence.

It is conceivable, if all these elements were connected to show a national policy of the agency over a long period of years, supported by judicial holdings initiating the construction and tying into the practice, an administrative construction might be shown by the evidence in another case. We would not have then the excuse that the matter had not been brought to our attention here. See United States v. Leslie Salt Co., 350 U.S. 383, 397, 76 S.Ct. 416, 100 L.Ed. 441, Note 13.

The following excerpt from this case 350 U.S. at pages 396–397, 76 S.Ct. at page 423 is pertinent:

"There are persuasive reasons for construing 'debentures' and 'certificates of indebtedness' in accordance with the Treasury's original interpretation of those terms in this statute's altogether comparable predecessors. In Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796, Mr. Justice Cardozo said:

" 'administrative practice, consistent and generally unchallenged, will not be overturned except for very cogent reasons if the scope of the command is indefinite and doubtful. United States v. Moore, 95 U.S. 760, 763, 24 L.Ed. 588; Logan v. Davis, 233 U.S. 613, 627, 34 S.Ct. 685, 58 L.Ed. 1121; Brewster v. Gage, 280 U.S. 327, 336, 50 S.Ct. 115, 74 L.Ed. 457; Fawcus Machine Co. v. United States, 282 U.S. 375, 51 S.Ct. 144, 75 L.Ed. 397; Interstate Commerce Comm. v. New York, N. H. & H. R. Co., 287 U.S. 178, 53 S.Ct. 106, 77 L.Ed. 248. The practice has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.'

"Against the Treasury's prior longstanding and consistent administrative interpretation its more recent ad hoc contention as to how the statute should be construed cannot stand. Moreover, that original interpretation has had both express and implied congressional acquiescence, through the 1918 amendment to the statute (76 S.Ct. 421), which has ever since continued in effect, and through Congress having let the administrative interpretation remain undisturbed for so many years. See Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 53, 76 S.Ct. 20, 24 [100 L.Ed. 29]; Norwegian Nitrogen Products Co. v. United States, supra, 288 U.S. at page 313, 53 S.Ct. at page 357. Still further, it is an interpretation which is in accord with the generally understood meaning of the term 'debentures.' Cf. First Nat. Bank of Cincinnati v. Flershem, 290 U.S. 504, 508, 54 S.Ct. 298, 78 L.Ed. 465. 'The words of the statute [a stamp tax statute] are to be taken in the sense in which they will be understood by that public in which they are to take effect.' United States v. Isham, supra, 17 Wall. [496] at page 504, 21 L.Ed. 728."

The cause should be remanded with directions for the trial court to find on the subject upon further evidence, or at least it should be recognized that such expressions are not binding upon this Court in another case.